STATE OF MAINE
CUMBERLAND, ss.



SUPERIOR COURT
CIVIL ACTION
Docket No. CV-03-569

TDW-CUM-12/1/05

JOHN JAMISON,

Plaintiff,

v.                                                          ORDER

OHI, SUZANNE PHILP, and
BONNIE-JEAN BROOKS,

Defendants.

Before the court is (1) a special motion by defendants OHI, Suzanne Philp, and Bonnie Lee Brooks to dismiss plaintiff John Jamison's complaint under Maine's anti-SLAPP statute, 14 M.R.S.A. § 556; and (2) a motion by defendants in the alternative for summary judgment.

Although the facts will be discussed in more detail below, they can be initially summarized as follows:

From March 2000 until he resigned in May 2001 Jamison was the administrator of Harrington House, a therapeutic residential program operated by OHI to serve the needs of children with social, emotional, behavioral, developmental and mental challenges. Defendants' statement of material facts filed March 8, 2005 ("Defendants' SMF") ¶¶ 2-3 (admitted). In July 2001, two months after Jamison's resignation, defendant Philp (then acting administrator of Harrington House) reported to DHHS various instances of abuse that had allegedly occurred at Harrington House while Jamison was the director. Defendants' SMF ¶ 28 (admitted in pertinent part). In March 2002, relying on Philp's information and without talking to Jamison to learn his side of the story, see Sennett Dep. 19, 41; Defendants' SMF ¶ 40, DHHS issued a letter to OHI

and defendant Brooks (OHI's Executive Director) stating (1) that the information obtained in the investigation substantiated physical and emotional abuse and (2) that certain license violations were also identified. On the issue of physical or emotional abuse, the letter stated that a specific resident of Harrington House had been physically and emotionally abused by John Jamison when he and other staff held her in a restraint for hours and that the same resident was physically and emotionally abused by Harrington House staff and John Jamison when she was "dragged" across the room by her ankles. Exhibit 41 at 12-13. Jamison was not sent a copy of this letter.

In March 2002, Brooks informed Jamison's supervisor at Port Resources, his new place of employment, that OHI had received a letter from DHHS substantiating allegations of abuse and/or neglect against Jamison. Defendants' SMF ¶ 38 (admitted in pertinent part). Prompted by Brooks, Jamison's new employer checked with DHHS, which confirmed the finding. Defendants' SMF ¶ 39 (admitted). Port Resources then placed Jamison on restricted status. Defendants' SMF ¶ 44 (admitted in pertinent part). Several weeks later, while still on restricted status, Jamison resigned his position with Port Resources. Defendant's SMF ¶ 66 (admitted). In the meantime, he had contacted DHHS to inquire how DHHS could substantiate alleged abuse without talking to him. Defendants' SMF ¶ 40. At that point DHHS reopened its investigation. Defendants' SMF ¶¶ 42-43 (admitted). DHHS eventually spoke directly with Harrington House staff members who had purportedly witnessed the incidents reported by Philp. Exhibit 41 at 16-17.

When interviewed, the staff members did not support the version of events previously supplied by Philp in a number of respects. Id. In November 2002, DHHS issued a new finding stating that the instances of physical and emotional abuse were now unsubstantiated. Exhibit 41 at 18. In its letter, DHHS noted that there were

licensing violations and repeated that a resident had been physically and emotionally abused. Id. at 18-19. However, all mentions of Jamison's name had been deleted.

Jamison is suing OHI, Philp, and Brooks, alleging that OHI and Philp defamed him by reporting false information to DHHS and that OHI and Brooks intentionally interfered with his contractual relationship with Port Resources by communicating to Port Resources that DHHS had substantiated allegations of abuse and/or neglect by Jamison while at Harrington House. He also alleges that OHI's conduct as a whole amounted to intentional infliction of emotional distress and seeks punitive damages.

A.    Defendants' Special Motion Under the Anti-SLAPP Statute

Maine's anti-SLAPP statute, 14 M.R.S.A. § 556, was enacted in 1995 as a measure to prevent the filing of lawsuits intended to dissuade or punish the exercise of First Amendments rights. Morse Brothers, Inc. v. Webster, 2001 ME 70 ¶ 10, 772 A.2d 842, 846.[1] Section 556 targets "plaintiffs who do not intend to win their suits; rather they are filed solely for delay and distraction, and to punish activists by imposing litigation costs on them for exercising their constitutional rights to speak and petition the government for redress of grievances." Maietta Construction, Inc. v. Wainwright, 2004 ME 53 ¶ 6, 847 A.2d 1169, 1173, quoting Morse Bros., 2001 ME 70 ¶ 10, 772 A.2d at 846 (internal quotations omitted).

Defendants contend that Jamison's claims against them are all based on defendants' exercise of their right of petition under the U.S. and Maine Constitutions and that as a result, Jamison's claims must be dismissed under 14 M.R.S.A. § 556. That provision provides in pertinent part as follows:

---

[1] SLAPP is an acronym for "Strategic Lawsuit Against Public Participation." Id.

> When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss . . . . The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party.

In support of their argument, defendants liken this case to the Maietta Construction and Morse Bros. cases and point out that Section 556 contains broad language that a party's exercise of its right of petition means "any written or oral statement made before or submitted to a legislative, executive, or judicial body . . . or any other statement falling within constitutional protection of the right to petition government." Philp's reports to DHHS, argue defendants, were written and oral statements "submitted to an executive body" and therefore entitled to protection under the anti-SLAPP statute.

In deciding a special motion to dismiss under 14 M.R.S.A. § 556, the court must first determine whether the claims against the moving party are based on the moving party's exercise of its constitutional right of petition. See Morse Bros., 2001 ME 70 ¶ 19, 772 A.2d 849. At the outset, it should be noted that although Jamison is primarily complaining about Philp's reports to DHHS, his claim of intentional interference with a contractual relationship also encompasses the actions of Brooks in informing Port Resources of the DHHS findings. Communication with Port Resources does not constitute the exercise of a right of petition even under the broad definition urged by defendants.

Moreover, the court ultimately concludes that Philp's reports also do not constitute the exercise of her right to petition the government. First, this case does not

4

involve what the Law Court has described as the "typical mischief" that Section 556 was designed to address – "lawsuits directed at individual citizens of modest means for speaking publicly against development projects." Maietta, 2004 ME 53 ¶ 7, 847 A.2d at 1173; Morse Bros., 2001 ME 70 ¶ 10, 772 A.2d at 846. This does not necessarily eliminate this case from the coverage of 556. However, it requires that careful consideration be given before a statute designed to protect one party's exercise of its right to petition is interpreted to impinge on another party's exercise of its own right to petition – specifically, its right to petition the courts for redress of grievances by filing a lawsuit.

Second, there is a question whether a party who is requesting action by the government but is not exercising either its right of free speech, as in Maietta, 2003 ME 53 ¶ 3, 847 A.2d at 1172, or its right of access to the courts, as in Morse Bros., 2001 ME 70 ¶¶ 3-5, 772 A.2d at 844-45, falls within the protection of Section 556. That question does not need to be answered in this case, however, because the actions of Philp here do not fall within the category of exercising her right to petition the government in any event. This is because Philp was reporting alleged instances of abuse pursuant to statutory mandatory reporting requirements imposed pursuant to 22 M.R.S.A. § 4011-A. Defendants' pleadings (including the affirmative defense that at all times defendants were under a compulsion to act as they did pursuant to the requirements of Maine Law), Philp's affidavit (noting that as a "mandatory reporter," she was legally obligated to make DHHS aware of the allegations), and defendants' invocation of 22 M.R.S.A.§ 4014, which provides immunity for reports made to DHHS in good faith, all demonstrate that Philp was not seeking redress from the government but was complying with a regulatory obligation. Where a party is not requesting action by the government but is providing information pursuant to a statutory mandate, that party is not exercising its right of petition for purposes of 14 M.R.S.A. § 556.

5

The court notes that if it were to conclude that Philp's actions here fell within the exercise of her right of petition, the special motion here would present some difficult issues. On this record, some of the reports made by Philp were not devoid of any reasonable factual support,[2] while others of her reports are at variance in all material respects with the later interviews DHHS conducted with staff members.[3] Whether those reports were devoid of any reasonable factual support depends solely on Philp's own testimony that she accurately reported what she was told at the time. And since Philp's credibility is at the heart of this case, allowing her to be the only source of evidence on this subject is highly problematic. The court does not need to reach this issue, however, because of its conclusion that the right of petition was not involved here.

Accordingly, defendants' special motion to dismiss is denied,[4] and the court must address their motion for summary judgment.

B.    Defendants' Motion for Summary Judgment

Summary judgment should be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. In considering a motion for summary judgment, the Court is required to consider only the portions of the record referred to and the material facts set forth in the parties' Rule 56(h) statements. E.g., Johnson v. McNeil, 2002 ME 99, ¶ 8, 800 A.2d 702, 704. The facts must be considered in the light most favorable to the non-moving party. Id. Thus, for

---

[2] E.g., Philp's report that there was a policy of not letting children eat if they declined to come to dinner, which is arguably based on what staff member Runnels told her.

[3] E.g., Philp's report that a resident was restrained when she was not posing a threat to herself or others. The subsequent staff interviews were all to the effect that the resident in question had been restrained when she was out of control (kicking, biting, etc.).

[4] Jamison argues that defendants' anti-SLAPP motion should be denied for the additional reason that it was originally filed eleven months after the case was commenced. The court has already ruled on that issue, see order filed November 16, 2004, and will add only that upon further review, it adheres to the view that Maietta did not extend the reach of the anti-SLAPP statute significantly beyond Morse Bros. The court believes that counsel's initial view that the statute was inapplicable (see Zmistowski Affidavit sworn to October 29, 2004 ¶ 3) confirms that it would be a stretch to apply Section 556 to the case at bar.

purposes of summary judgment, any factual disputes must be resolved against the movant. Nevertheless, when the facts offered by a party in opposition to summary judgment would not, if offered at trial, be sufficient to withstand a motion for judgment as a matter of law, summary judgment should be granted. Rodrigue v. Rodrigue, 1997 ME 99 ¶ 8, 694 A.2d 924, 926.

At the outset, although Jamison has included causes of action for negligent infliction of emotional distress and for fraudulent concealment, he has not pursued these claims in his papers. Moreover, a negligent infliction of emotional distress claim cannot stand alone in the absence of a duty "based on the unique relationship of the parties." Bryan R. v. Watchtower Bible and Tract Society, 1999 ME 144 ¶ 31, 738 A.2d 839, 848, cert. denied, 528 U.S. 1189 (2000). The relationship of a former employer to its former employee has not been recognized as giving rise to a duty to avoid emotional distress. See id. ¶ 32, 738 A.2d at 849. While Jamison might be entitled to damages for emotional distress if he is successful on some of his other claims, his negligent infliction of emotional distress claim must be dismissed.

Similarly, although the complaint includes a count for fraudulent concealment, that is not a separate tort but a means of overcoming the statute of limitations. See 14 M.R.S.A. § 859. As discussed below, the court does not need to reach Jamison's fraudulent concealment argument under the circumstances of this motion.

That leaves Jamison's claims for defamation, intentional interference with a contractual relationship, and intentional infliction of emotional distress. Before addressing those claims, the court must first consider defendants' assertations of statutory immunity.

7

1. Immunity

In their motion for summary judgment, defendants have invoked immunity under two statutes. The first is 22 M.R.S.A. § 4014, which proves in pertinent part that

> [a] person . . . participating in good faith in reporting under this subchapter or participating in a child protection investigation or proceeding . . . is immune from any criminal or civil liability for the act of reporting or participating in the investigation or proceeding. Good faith does not include instances where a false report is made and the person knows the report is false.

22 M.R.S.A § 4014(1).

The second immunity invoked by defendants is immunity under the Maine Tort Claims Act, 14 M.R.S.A. §§ 8103, 8111. Acknowledging that defendants Philp and Brooks are not employed by the state or by any local government, defendants nevertheless contend that Philp and Brooks were "governmental employees" for purposes of 14 M.R.S.A. § 8102(1) because they were acting "on behalf" of a governmental entity.

While the Law Court has extended the immunity for governmental employees to some individuals who are not employed by the government, see Hinkley v. Penobscot Valley Hospital, 2002 ME 70 ¶ 18, 794 A.2d 643, 648; Taylor v. Herst, 537 A.2d 1163, 1165 (Me. 1988), none of those situations is comparable to the situation presented in this case. The relevant individual in the Taylor case was performing the governmental function of determining whether a mentally ill individual should be involuntarily committed. 537 A.2d at 1165. The relevant individual in the Hinkley case was acting as the supervising physician of a physician's assistant employed at a county hospital. 2002 ME 70 ¶ 18, 794 A.2d at 648. Neither Philp nor OHI were performing governmental functions in this case. The statutory requirement that they report instances of abuse to DHHS does not mean that they were acting "on behalf" of DHHS.

Accordingly, while 22 M.R.S.A. § 4014 is potentially applicable to this action, defendants cannot claim the benefit of the Maine Tort Claims Act.[5]

## 2. Defamation – Legal Issues

Turning specifically to Jamison's defamation claims, Jamison must first of all establish the existence of disputed issues for trial as to whether he was defamed by either Philp or Brooks. Under Maine law, the elements of a claim of defamation are "(1) a false and defamatory statement concerning another; (2) unprivileged publication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) special harm or actionability regardless of special harm." Cole v. Chandler, 2000 ME 104 ¶ 5, 752 A.2d 1189, 1193. On the issue of whether a publication was privileged, the defendant has the burden of proving the circumstances necessary for the existence of a privilege. Saunders v. Van Pelt, 497 A.2d 1121, 1125 (Me. 1985). If the defendant does so, the plaintiff then has the burden of proving that the privilege was abused. Id.

Under the law of defamation, a conditional privilege is abused if a person who communicates false and defamatory information either (1) knows the information to be false or (2) acts in reckless disregard as to its truth or falsity. Restatement, Second, Torts § 600 (1977). Thus, both for purposes of the statutory immunity under 22 M.R.S.A. § 4014 and for purposes of conditional privilege under the law of defamation, no privilege exists if knowingly false information is communicated. While the law of defamation provides that a conditional privilege is also abused if false and defamatory information is recklessly communicated, the statutory immunity provision does not

---

[5] One other issue can be disposed of summarily – defendants' contention that Jamison's claims are somehow barred by the doctrine of collateral estoppel based on the findings made by DHHS after it reopened its investigation. The short answer to this argument is (1) the DHHS findings in question did not constitute the kind of final administrative determination that is entitled to collateral estoppel effect; (2) the DHHS findings in question deleted Jamison's name from its findings that abuse had occurred; and (3) Jamison did not have a full and fair opportunity to litigate before DHHS.

9

contain an exception for recklessness. See 22 M.R.S.A. § 4014. The court concludes that where reports to DHHS are concerned, the statutory immunity provision is controlling and requires Jamison to show either that Philp made a knowingly false report or that she made a false report with the intent to harm Jamison.

Finally, there is a two-year statute of limitations applicable to defamation claims. This action was commenced on October 17, 2003. As defendants point out, this means that claims based on Philp's initial reports to DHHS in July 2001 are time barred. As Jamison points out, however, there is evidence that in January 2002 Philp was interviewed by DHHS licensing investigator Pamela Sennett and provided her with incident reports Philp had drafted in July 2001 and with an internal investigation report. Plaintiff's SMF ¶ 30; Exhibit 41 at 11. Those documents repeat the same information provided in Philp's July 2001 initial report. Accordingly, Philp is not entitled to summary judgment on statute of limitation grounds.

### 3. Defamation Claims Against Philp – Factual Issues

It does not appear to be disputed that, if Philp's reports to DHS were false, they were also defamatory in that they were harmful to Jamison's reputation. See Restatement, Second, Torts § 559. Nor does it appear to be disputed that Philp's reports, if false, affected his fitness for his profession and would therefore be actionable even absent proof of special harm. Id. § 573. For purposes of summary judgment, the dispositive issues are whether there are disputed issues as to the falsity of Philp's reports and if so, whether there are disputed issues with respect to Philp's knowledge of any falsity.[6]

---

[6] In their statement of material facts, defendants seek to have the court consider the views expressed by DHHS employees at certain points in the process that they did not believe Jamison was being forthright.

The court concludes that there are disputed issues for trial as to whether Philp's reports to DHS were false. Indeed, it is difficult to evaluate the facts in this case without concluding that a significant injustice may have been done to Jamison. Specifically, Philp's reports concern four categories of alleged abuse and/or neglect. In each category, Jamison can point to later DHS interviews which paint a significantly different picture.[7]

One instance of alleged neglect or abuse reported by Philp, and perhaps the most serious, was that a specific resident of Harrington House had been subjected to physical restraints when she did not pose a threat to herself or others and on other occasions was retained for unreasonable lengths of time, including one occasion for up to four hours in which Jamison instructed the staff to take turns keeping her in a MANDT hold[8] and not to document it. See Defendants' SMF ¶ 14; Exhibit 5.

When DHHS did its own interviews of the relevant staff members, however, one staff member stated that although there were some lengthy restraints, the staff had let go every three minutes as required and would restrain again only if the child got out of control. According to that staff member, restraints were used when kids were threatening staff or other kids by hitting, kicking, throwing things, or threatening to hurt themselves. With respect to the particular resident referred to in Philp's report, the staff member reported that Jamison would try to release the resident every three minutes but she would kick or bite and they often had to hold her until she fell asleep.

E.g., Defendants' SMF 46, 65. The court emphatically agrees with Jamison that opinions expressed by one witness as to another witness's credibility are inadmissible. E.g., State v. Gilman, 637 A.2d 1180, 1181 (Me. 1994); State v. Steen, 623 A.2d 146, 148-49 (Me. 1993). Whether Jamison was being forthright or whether he was loath to speak to DHHS in the absence of his attorney and without being advised of the contents of the original reports made against him is an issue for the trier of fact. Opinions of DHHS employees on that issue are not admissible.

[7] The DHHS records containing these interviews (Exhibit 41 at 14-17 and 23-24) have been shown to be admissible in evidence under M.R.Evid. 803(6) and 803(8)(A). See Plaintiff's SMF ¶ 93; Drake Dep. 101-102.

[8] A MANDT hold is a particular form of physical restraint. The summary judgment record does not provide any additional details.

Another staff member did not recall such lengthy restraints but said that when restraints were used, they would let go every three minutes and continue if the child was still out of control. Exhibit 41 at 16-17.

When Jamison himself was asked about the use of restraints on the specific resident referred to in Philp's reports, he told DHHS that she was frequently out of control but when restrained they would follow protocol and let go every three minutes "but she was so out of control they would need to do this until she got tired." Exhibit 41 at 17. The resident herself, when interviewed by DHHS, said she had been placed in restraints all the time, but it was "no big deal." She recalled that she had been placed in restraints for hours once when she "was being destructive" and that she could not remember who had been present but thought Jamison had been there.[9] Exhibit 41 at 15. The resident also volunteered that Jamison had been "awesome and was the only one that cared about the kids." Id. at 14. In the DHHS interviews the staff members did not say that they had been told by Jamison not to document restraints, as Philp had asserted.[10]

In this connection, the record also reflects an acknowledgment by DHHS that MANDT restraints are permissible when a child's own safety or the safety of another person is at risk. Plaintiff's SMF ¶ 55, citing Drake Dep. 81. On the basis of the DHHS interviews with Harrington House staff, although there may be a basis for concern that the use of restraints for long periods may not be ideal, the court does not see a basis to conclude that restraints were impermissibly employed.

The second alleged instance of abuse reported by Philp was that a "typical protocol" used at Harrington House was that out of control children were locked out of

---

[9] The resident apparently was not asked if she had been released every three minutes.
[10] There is also no indication in the DHHS reports that the staff members were asked whether this was true.

12

the house and denied re-entry, with the foyer being used as an isolation room. Exhibit 6. The later DHS interviews reflect a somewhat different picture: that there was a heated, lighted foyer used as a "time out" room for kids who were out of control but that staff would stay out with the children to talk to them and calm them down. Exhibit 41 at 16-17. The same resident interviewed in connection with restraints described one occasion when she had been locked out - apparently without staff present although one staff member had come out and checked on her. She eventually had crawled back in through her bedroom window. Exhibit 41 at 15. That same resident also said, however, that Jamison did not know about this incident and would never have allowed it. Id.

The third alleged incident of abuse reported by Philp involved one or more occasions when staff members were allegedly instructed to drag the same resident involved in the restraint incidents[11] by her ankles. According to Philp, on one occasion a staff member refused, reported the incident to Jamison but was told she could lose her job if she did not do as she was told. Exhibit 10. According to the DHHS records, that same staff member, when interviewed by DHHS, stated that on one occasion she and another staff member had attempted to restrain the resident, that the resident had wriggled away, and that they had then picked the resident up by her ankles and moved her about 9 feet before the staff member stopped and said they shouldn't be doing this. The staff member did not state that she had been instructed to drag the resident. She did state that when she had later talked to Jamison about this, he had said she needed to do what she was told or she could lose her job. Exhibit 41 at 16. The resident herself stated she did not think she had been dragged but she thought another resident had been dragged at one point by unidentified staff. Exhibit 41 at 15.

---

[11] That resident was described by one staff member as "always in crisis." Exhibit 41 at 16.

The final alleged instance of abuse or neglect reported by Philp was the existence of a standard protocol not to allow children to eat meals outside of the scheduled mealtimes. Exhibit 7. When staff was later interviewed by DHHS, however, they stated that the children could always have something to eat. If the children did not come to eat on time, they could eat leftovers or a sandwich and there was also a snack before bed. Exhibit 41 at 16-17.

The above evidence is more than sufficient to demonstrate the existence of disputed issues of fact as to the falsity of all of the alleged instances of abuse reported by Philp. The more difficult question is if there are disputed factual issues as to whether Philp knew that her allegations were false or otherwise acted in bad faith in order to overcome the immunity set forth in 22 M.R.S.A. § 4014. Thus, just because a significant injustice may have been done[12] does not necessarily mean that Jamison is entitled to a trial, given the legislature's policy decision to immunize even recklessly false reports made to DHHS because of the importance of those reports.

Whether Jamison has demonstrated the existence of a disputed issue for trial as to whether Philp's reports were knowingly false is, on this record, a close question. Significantly, no direct evidence has been offered to refute Philp's assertions as to what she was told in July 2001. Thus, while the relevant staff members told DHHS markedly different versions when interviewed in November 2002, Jamison has offered no affidavits or deposition testimony from the staff members in question denying that they originally told Philp what Philp had reported. The only way that the court could

---

[12] If an injustice was done here, DHHS also bears some responsibility. According to the record, it appears that DHHS waited five months before taking any action on the reports made by Philp and then "substantiated" the allegations of abuse relying only on Philp's information, without ever talking to Jamison or anyone with first hand knowledge of the alleged events. Thereafter DHHS did reopen the file and ultimately interviewed the relevant staff and the resident primarily involved and removed the finding of substantiated abused as to Jamison. On the basis of the record before the court, however, some of the statements contained in DHHS's final and updated report finding licensing violations (Exhibit 41 at 18-19) are questionable.

14

conclude that there is a disputed issue of fact as to whether Philp knew her reports were false would be if it were to conclude that a fact finder could draw such an inference from the sheer number of discrepancies between what Philp wrote in July 2001 and what the staff members reported to DHHS in November 2002.

It is also possible to conclude, however, that staff members' memories had deteriorated between July 2001 and November 2002, or that Philp had misunderstood what she was told in July 2001, or that Philp was an alarmist, or that the staff members were more candid with Philp in July 2001 then they were with DHHS in November 2002.[13] Moreover, DHHS did not interview all the staff members Philp says she talked to, and some of the staff members not interviewed by DHHS might have offered more corroboration of Philp's reports. Because Jamison has the burden of overcoming the presumption of good faith, see M.R.S.A. § 4014(3), the court concludes that he has to offer some evidence not just that Philp's reports were false but that she knew they were false before he can be found to have raised a factual dispute for trial on this issue. See Gautschi v. Maisel, 565 A.2d 1009, 1011 (Me. 1989) ("Gautschi offered no evidence by affidavit, deposition or otherwise that Preston had not said the things Maisel reported").

The court concludes that Jamison has not met his burden. As noted above, he has not offered any direct evidence to rebut Philp's assertions that her reports to DHHS accurately reflected what she had been told. In the court's view, Jamison could avoid summary judgment if he had offered any evidence of a motive on Philp's part to falsify. Such evidence would permit an inference that Philp's reports were knowingly false and

---

[13] In this case it is apparently not disputed that Philp's inquiries began when she saw an entry in the logbook by staff member Katherine Runnels stating that if kids refuse to eat during a meal, they should not be allowed to eat until snack. Defendants' SMF ¶ 6 (admitted in pertinent part). Although Jamison points out that Philp elsewhere acknowledged that Runnels sometimes invented policies on her own, see Plaintiff's SMF ¶ 6, there is no evidence to controvert Philp's statement that she started her investigation because she was concerned about the entry made by Runnels.

15

would also demonstrate the existence of a factual dispute as to whether Philp was otherwise acting with the good faith necessary for immunity under 22 M.R.S.A. § 4014.

The court concludes, however, that Jamison has not offered evidence that Philp had any animosity toward Jamison. Jamison has instead offered evidence suggesting that Philp was overwhelmed and possibly out of her depth. E.g., Plaintiff's SMF ¶ 17. That evidence does not demonstrate the existence of a disputed issue for trial because – if believed – it would suggest at worst negligence or misunderstanding on Philp's part, rather than knowing falsity. Jamison has also suggested that Philp was predisposed to the view that the prior administration of Harrington House had been unsatisfactory. Plaintiff's SMF ¶ 93.[14] However, the fact that Philp might have been too ready to jump to conclusions does not suggest that she knew her reports were false. A different conclusion might be reached if a DHHS investigation had already been underway because Philp might then have had a motive to blame Jamison in order to exonerate herself. But the evidence is undisputed that until Philp made her reports, DHHS had no knowledge of the alleged abuses.

Jamison points out that the notes Philp made of her interviews with staff in July 2001 are now missing and suggests that an adverse inference should be drawn as a result. However, in Lester v. Powers, 596 A.2d 65, 71-72 (Me. 1991), the Law Court was faced with a similar argument and nevertheless affirmed a decision granting summary judgment. Absent some indication that the notes in question were destroyed after the initiation of the lawsuit, the absence of the notes is insufficient in a case of this nature to permit an inference of knowing falsity.

---

[14] Paragraph 93 of Plaintiff's SMF refers to Exhibit 41 at pages 8-9. Although those pages were not specifically authenticated as business records, see Drake Dep. 101-02, they are identical to the type of records that were authenticated as business records, and the testimony as to business records concerned records of the same "type." See id. Defendants have not objected to the admissibility of pages 8 and 9 of Exhibit 41.

Jamison also points out that there is evidence Philp made reports to DHHS that referred to alleged "standard protocols" in effect while Jamison was the administrator when Philp had not reviewed the actual written protocols and policies that were operative during Jamison's tenure at Harrington House. Plaintiff's SMF ¶ 18. This evidence might be sufficient to create a disputed issue as to recklessness on Philp's part, but is not sufficient to demonstrate the existence of a disputed issue for trial as to knowing falsity. The letter is necessary to overcome the statutory immunity contained in 22 M.R.S.A. § 4014.

In sum, the court interprets Law Court precedent in the area of defamation as requiring evidence of <u>knowing</u> falsity that goes beyond a showing of falsity itself. See, e.g., <u>Lester v. Powers</u>, 596 A.2d at 71 ("evidence that some of Powers's factual premises were objectively false, or even that no reasonable person would have believed them to be true, does not show that she knew or disregarded their falsity"). It concludes that Jamison has failed to demonstrate the existence of disputed facts as to the availability of immunity under 22 M.R.S.A. § 4014. Moreover, since all of Jamison's claims against Philp – not just his defamation claim - are based on Philp's reports to DHHS, and since Section 4014 immunity would also apply to those claims, summary judgment shall be granted in favor of Philp on all claims.

### 4. Claims Against Brooks

Jamison's claims against Brooks require a somewhat different analysis. Jamison's complaint alleges that in addition to Philp, Brooks also made various false and defamatory statements to DHHS. In response to the motion for summary judgment, he has focused on two instances when Brooks allegedly made statements to DHHS. The first involves statements allegedly made on March 25, 2002 and reflected in

17

certain handwritten notes found in the DHS file. Plaintiff's SMF 97; Exhibit 41 at 3. As defendants point out, however, that page of Exhibit 41 was never authenticated as a business record and does not resemble the portions of Exhibit 41 that were authenticated. Rule 56(e) requires that parties set forth facts that would be admissible in evidence on a motion for summary judgment. On this record, Page 3 of Exhibit 41 is inadmissible, unauthenticated hearsay and does not create disputed issues for trial with respect to false and defamatory statements allegedly made by Brooks on March 25, 2002.

The second instance in which Jamison complains of statements of made by Brooks to DHHS involves an April 2, 2002 letter sent by Brooks to DHHS expressing concern about Jamison's employment at Port Resources. Plaintiff's SMF ¶ 98; Exhibit 13. The letter does not make any direct allegations of abuse but implies there may be problems if Jamison has direct responsibility for "vulnerable individuals." However, Jamison has not offered any evidence that Brooks either knew or even had reason to know that allegations of abuse against him were unfounded when she wrote the April 2, 2002 letter, and her statements in the April 2, 2002 letter are therefore entitled to immunity under 22 M.R.S.A. § 4014.

The final defamation claim relating to Brooks concerns her conversation with Jamison's supervisor at Port Resources in March 2002. Although the information communicated was apparently limited to the general assertion that DHHS had substantiated abuse and/or neglect by Jamison, the publication of false and defamatory statements even if attributed to others can still form the basis for a claim of defamation. See, e.g., Restatement, Second, Torts § 581A, comment e. Brooks's conversation with Port Resources is also not subject to the statutory immunity for reports to the DHHS set forth in 22 M.R.S.A § 4014. Defendants, however, contend that under the law of

18

defamation, a conditional privilege would nevertheless apply to this conversation. See Restatement, Second, Torts §§ 595(1), 596; Defendants' Special Motion to Dismiss and Motion for Summary Judgment, filed March 8, 2005, at 22 n.5.

Whether a conditional privilege exists is an issue of law to be determined by the court. Saunders v. Van Pelt, 497 A.2d at 1125. A conditional privilege arises in settings where society has an interest in promoting free, but not absolutely unfettered, speech. Lester v. Powers, 596 A.2d at 69. In this instance no common interest existed between OHI and Port Resources, see Restatement, Second, Torts § 596, comment d, so the existence of a conditional privilege must be analyzed in terms of the interests of Port Resources, as Jamison's employer, in receiving the kind of information that was communicated by Brooks. See Restatement, Second, Torts § 595.

Under Restatement § 595(2)(a), one relevant factor is whether the information was volunteered or solicited. In this case Brooks volunteered the information in question. Defendants' SMF ¶ 38; MacDonald Aff. ¶ 3.[15] Nevertheless, the court concludes that under the circumstances presented, Port Resources had a sufficient interest in knowing about possible prior abuse by one of its employees, and there was a sufficient societal interest in protecting vulnerable children, that a conditional privilege existed as to the communications made to Port Resources by Brooks.[16]

The remaining question is whether there are disputed issues for trial as to whether Brooks abused that privilege. A conditional privilege is abused if the person making the communication either knows her statement to be false or recklessly disregards its truth or falsity. Lester v. Powers, 596 A.2d at 69; Restatement, Second,

---

[15] As a result, this is not a case where a conditional privilege exists for comments on employment qualifications that were made "in the normal channels of an employment review." Lester v. Powers, 596 A.2d at 68, citing Gautschi v. Maisel, 565 A.2d at 1011 (Me. 1989).

[16] See Restatement, Second, Torts § 595, comment i (recognizing that former employers are conditionally privileged under many circumstances to communicate information about the character or conduct of their former employees to succeeding employers).

Torts § 600. A conditional privilege is also abused if the person seeking the communication acts out of spite or ill will. Lester v. Powers, 596 A.2d at 69 n. 7; Restatement, Second, Torts § 603.

In response to defendants' motion for summary judgment, Jamison has not offered any evidence either that Brooks knew the allegations of abuse to be false, or that she acted in reckless disregard of whether the abuse allegations were true or false, or that she acted out of malice toward Jamison. Whatever inadequacies there may have been in the report made by Philp and whatever false information was contained therein, there is no evidence on this record that Brooks knew that information to be false or recklessly disregarded the possibility that it was false. Accordingly, summary judgment must also be granted dismissing Jamison's defamation claims against Brooks.

For the same reasons, summary judgment must also be granted on Jamison's claim against Brooks for interference with a contractual or advantageous relationship. While her communications to Port Resources may have had an adverse effect on Jamison's employment at Port Resources, a necessary element of a claim for interference with a contractual relationship is that the interference must be accomplished through fraud or intimidation. E.g., Rutland v. Mullen, 2002 ME 98 ¶ 14, 798 A.2d 1104, 1111. The absence of any evidence that Brooks knew the allegations of abuse were false or acted in reckless disregard of the possibility that they were false demonstrates that Jamison has not raised a factual dispute for trial as to whether Brook's interference with his employment was accomplished through fraud.

Moreover, given the court's conclusion that a conditional privilege exists, summary judgment must also be granted dismissing Jamison's claims of intentional infliction of emotional distress based on Brooks's actions. The issue of whether a defendants' alleged conduct is sufficiently extreme or outrageous to meet the standard

20

for intentional infliction is an issue for the court to determine in the first instance. Champagne v. Mid-Maine Medical Center, 1998 ME 87 ¶ 16, 711 A.2d 842, 847. Having concluded that there is a sufficient societal interest to permit communications from former to current employers relating to the possibility of past abuse by a former employee the court is constrained to conclude that Brooks's alleged conduct was not "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized society." See Restatement, Second, Torts § 46, comment d. In the absence of evidence that Brooks either knew Philp's allegations of abuse were false or recklessly disregarded that possibility, her conduct simply cannot be found to have exceeded all permissible bounds of decency.

### 5. Other Issues

Given the above rulings, it is evident that summary judgment must be granted dismissing the second amended complaint in its entirety. Jamison has also asserted claims against OHI, but those claims are based on the actions of Philp and Brooks and cannot stand once it has been found that Philp and Brooks are entitled to summary judgment.

Once his other claims are dismissed, Jamison's claims for punitive damages must be dismissed as well. Punitive damages can only be awarded if a plaintiff receives compensatory damages. Jolovitz v. Alfa Romeo Distributors, 2000 ME 174 ¶ 11, 760 A.2d 625, 629.

The entry shall be:

21

Defendants' special motion to dismiss is denied. Defendants' motion for summary judgment dismissing the complaint is granted. The clerk is directed to incorporate this order in the docket by reference pursuant to Rule 79(a).

Dated: November 28, 2005

Thomas D. Warren
Justice, Superior Court

THAD ZMISTOWSKI, ESQ.
PO BOX 1210
BANGOR, ME 04402-1210



JAMES HUNT, ESQ.
PO BOX 568
PORTLAND, ME 04112-0568